**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION**


**MARGARET LOFGREN-DENNINGER,**

  **Plaintiff,**

**vs.**                                       **CASE NO. 1:06CV143-MP/AK**

**MICHAEL J. ASTRUE,[1]
Commissioner of Social Security**

  **Defendant.**

_____/


**REPORT AND RECOMMENDATION**

This action is brought pursuant to 42 U.S.C. § 405(g) of the Social Security Act

(Act) for review of a final determination of the Commissioner of Social Security

(Commissioner) denying Plaintiff's application for disability insurance benefits (DIB) filed

under Title II of the Act.

Upon review of the record, the Court concludes that the findings of fact and

determinations of the Commissioner are supported by substantial evidence; thus, the

decision of the Commissioner should be affirmed.

---

  [1] On February 12, 2007, Michael J. Astrue became the Commissioner of Social
Security.  Pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure, Michael J.
Astrue should be substituted, therefore, as the Defendant in this suit.  No further action
need be taken to continue this suit by reason of the last sentence of section 205(g) of
the Social Security Act, 42 U.S.C. §405(g).

A.    **PROCEDURAL HISTORY**

Plaintiff filed an application for DIB on December 27, 2002, alleging a disability onset date of July 12, 2001, because of mental health problems, as well as head trauma resulting in headaches, memory loss and equilibrium problems.  Plaintiff petitioned for a hearing before an administrative law judge (ALJ), who conducted  hearings on June 13, 2005, and November 7, 2005, and entered an unfavorable decision on February 15, 2006.  The Appeals Council denied Plaintiff's request for review, thus making the decision of the ALJ the final decision of the Commissioner.  This action followed.

B.    **FINDINGS OF THE ALJ**

Plaintiff was last insured for benefits on December 31, 2002, and therefore, must establish disability on or before that date.  Since her onset date is July 12, 2001, she must establish disability between these two time periods.  The ALJ found that she has severe impairments of headaches, moderate degenerative disc disease of the cervical spine, dizziness, and weakness, status post head trauma in a motor vehicle accident, and depression.

After careful consideration of the record, the ALJ found Plaintiff capable of performing simple, unskilled, low stress work, with one, two or three step instructions, not in close proximity to others, able to lift and carry 10 pounds frequently and 20 pounds occasionally, able to sit, stand and walk for 6 hours out of an 8 hour day, with a sit/stand option, should avoid frequent stairs, with only occasional balancing, stooping, crawling, crouching and kneeling, with no climbing.  Because she experiences drowsiness from her pain medication, she should avoid hazardous machinery, heights,

**No. 1:06CV143-MP/AK**

ramps, ladders, scaffolding, unprotected regions of holes and pits, no motor vehicle operation, and a relatively clean environment.  Her depression affects her ability to concentrate on complex or detailed tasks, but she can do simple job instructions.

In making these findings, the ALJ accorded great weight to Dr. Cerra's treatment notes from February 2001 through the relevant time period, but not his opinion in July 2005, which may establish her current condition, but was not consistent with his treatment notes of her condition prior to the expiration of her insured status.  He also accorded great weight to the chiropractor's notes and opinions, which were also made during the relevant time period when he found her able to perform normal occupational functioning.  The ALJ did not attribute much weight to the opinion of Dr. Bordini, finding that the doctor's test results were so inconsistent with his ultimate opinion that it almost seemed as if he were talking about a different individual.  The ALJ also found Plaintiff to be vague and ambiguous at the hearing, as she had been in giving her history to Dr. Hoehn and Dr. Greenberg.  She reported an inability to perform even sedentary work, yet went on a mission to the Honduras in 2002, as well as reported to Dr. Hoehn that she was working full time as a care giver to an elderly woman.  She was given the opportunity to explain the inconsistencies in the record at a supplemental hearing held on November 7, 2005, but testified only that the records were "wrong."  She was paid wage losses during the relevant time period by her insurance company and the evidence supports a finding that she was working full time between July 12, 2001, and December 31, 2002.

**No. 1:06CV143-MP/AK**

The ALJ found that she could not perform the full range of light work, but the vocational expert testified at the hearing that there were a number of jobs she could perform such as house-sitter and companion/attendant. Thus, she was not disabled.

**C.    ISSUES PRESENTED**

Plaintiff argues that the ALJ erred in accepting the opinions of non-examining physicians and that of a chiropractor over the opinions of treating physicians; in rejecting Plaintiff's credibility based on factors not supported by the record; the ALJ's finding that Plaintiff could perform light work is not supported by the record; and the VE's testimony about other jobs Plaintiff could perform was based on a defective hypothetical.

The Commissioner responds that the opinion of Dr. Cerra was conclusory and the ALJ properly relied upon his medical findings rather than his opinion.  Dr. Cerra also rendered his opinion two and a half years after Plaintiff's insured status expired.  The ALJ was not required to give weight to the opinion of Ms. Marshall, the massage therapist, who did not meet the regulations for being a treating physician.  The opinions of Dr. De Paz and Dr. Kanter were considered and supported the ALJ's finding that Plaintiff suffered from moderate degenerative disc disease, which the ALJ found to be severe.  The opinion of Dr. Bordini was rendered following an examination conducted nine months after Plaintiff's insured status expired.  The non-examining physicians opinions were consistent with the medical findings of Drs. Cerra and Nazario as to Plaintiff's mental health.  Dr. Hoehn's records and findings were especially relevant and

**No. 1:06CV143-MP/AK**

accorded great weight because he treated Plaintiff during the relevant time period and he found that she could perform most work functions.

The ALJ expressed his reasons for finding Plaintiff less than credible, the fact that she was working during the time period, the fact that Dr. Hoehn found her capable of working during the relevant time period, that her consultative examinations were mostly normal, and her daily reported activities, a trip to the Honduras and swimming, were inconsistent with her complaints of disabling pain.

Finally, the hypothetical posed to the VE included only those limitations the ALJ found to be supported by the record and the limitations he did not include in his RFC and the hypothetical were conditions not found prior to her date last insured.

The issue thus presented is whether the Commissioner's decision that Claimant is not disabled is supported by substantial evidence in the record and decided by proper legal standards.

D.    **STANDARD OF REVIEW**

Title 42 U.S.C. § 405(g) sets forth the standard of review for this court.  The Commissioner's decision must be affirmed if it is supported by substantial evidence and the correct legal standards have been applied.  Graham v. Apfel, 129 F.3d 1420, 1422 (11th Cir. 1997).  Findings of fact by the Commissioner which are supported by substantial evidence are conclusive. 42 U.S.C. § 405(g). Miles v. Chater, 84 F.3d 1397, 1400 (11th Cir. 1996).  "Substantial evidence" has been defined to mean "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

**No. 1:06CV143-MP/AK**

Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995) (citation omitted) (per curiam).  It

is more than a scintilla, but less than a preponderance.  Bloodsworth v. Heckler, 703

F.2d 1233, 1239 (11th Cir. 1983) (citations omitted).  The court may not reweigh the

evidence or substitute its judgment for that of the Commissioner.  Wolfe v. Chater, 86

F.3d 1072, 1076 (11th Cir. 1996).  It must determine only if substantial evidence

supports the findings of the Commissioner.  See Bridges v. Bowen, 815 F.2d 622, 624

(11th Cir. 1987) (per curiam).  Even if substantial evidence exists which is contrary to

the Commissioner's findings, where there is substantially supportive evidence of the

Commissioner's findings, the court cannot overturn them.  Barron v. Sullivan, 924 F.2d

227, 230 (11th Cir. 1991).  Unlike the deferential review accorded to the

Commissioner's findings of fact, his conclusions of law are not presumed valid. Martin v.

Sullivan, 894 F.2d 1520, 1529 (11th Cir. 1990) (citations omitted).  The Commissioner's

failure to apply correct legal standards or to provide the reviewing court with an

adequate basis for it to determine whether proper legal principles have been observed

requires reversal.  Id. (citations omitted).

      A disability is defined as an "inability to engage in any substantial gainful activity

by reason of any medically determinable physical or mental impairment which can be

expected to result in death or which has lasted or can be expected to last for a

continuous period of not less than 12 months . . . ."  42 U.S.C. § 423(d)(1)(A).  To

qualify as a disability the physical or mental impairment must be so severe that claimant

is not only unable to do his previous work, "but cannot, considering his age, education,

**No. 1:06CV143-MP/AK**

and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ."  42 U.S.C. § 423(d)(2)(A).

Pursuant to 20 C.F.R. § 404.1520(a)-(f), the Commissioner analyzes a claim in five steps:

1.     Is the individual currently engaged in substantial gainful activity?

2.     Does the individual have any severe impairment?

3.     Does the individual have any severe impairments that meet or equal those listed in Appendix 1 of 20 C.F.R. Part 404?

4.     Does the individual have any impairments which prevent past relevant work?

5.     Do the individual's impairments prevent any other work?

A finding of disability or no disability at any step renders further evaluation unnecessary.  Plaintiff bears the burden of establishing a severe impairment that keeps him from performing his past work.  If Plaintiff establishes that his impairment keeps him from his past work, the burden shifts to the Commissioner at step five to show the existence of other jobs in the national economy which, given Plaintiff's impairments, Plaintiff can perform.  Chester v. Bowen, 792 F.2d 129, 131 (11th Cir. 1986); MacGregor v. Bowen, 786 F.2d 1050, 1052 (11th Cir. 1986).  If the Commissioner carries this burden, Plaintiff must prove that he cannot perform the work suggested by the Commissioner.  Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).  It is within the district court's discretion to affirm, modify, or reverse a Commissioner's final

**No. 1:06CV143-MP/AK**

decision with or without remand. 42 U.S.C. § 405(g); <u>Myers v. Sullivan</u>, 916 F.2d 659, 676 (11th Cir. 1990).

**E.    SUMMARY OF CLAIMANT'S RELEVANT MEDICAL HISTORY**

Plaintiff had two injuries which she contends resulted in her present disability. She was hit on the head when someone slammed a van door on her in July 2000, but Dr. Lance Chodosh, who treated her after this incident, found no evidence of trauma on a CT scan and diagnosed mild concussion. (R. 570-571). He suggested she stay off work for 2 to 3 days. (R. 570). Dr. Chodosh also treated her after a rear end car accident in July 2001, again finding no evidence of trauma, and no follow up visit was scheduled. (R. 224-225, 568-569).

Dr. Rossi, a neurologist, began treating her in September 2000 following the head injury for headaches, neck pain and insomnia. (R. 226-241). He treated her with medication and found her to be improved in March 2001, prior to the car accident. (R. 228). In January 2001, she told him she was working 12 hours a day, three days a week, which was causing her stress and she would cut back. (R. 239). On March 8, 2001, he wrote a "To Whom it May Concern" letter stating that she should be limited to working one day a week because "she had been experiencing physical exertion." (R. 241). Dr. Ross also prepared a Letter to the Chart dated July 15, 2002, in preparation of moving his practice and turning Plaintiff's care over to Dr. Werner that "I do not think that right now she is competent to work not only from the physical, but from the mental point of view either." (R. 504). He made this statement following a neurological

**No. 1:06CV143-MP/AK**

examination that was normal and her subjective complaints of pain "all over."  He pointed to "post-traumatic head concussion," as the cause, but also opined that there could be "underlying psychiatric problems like a bipolar disorder," to which he would defer to a psychiatrist.  (R. 504).

Dr. Cerra, a psychiatrist, began treating her on February 26, 2001, for headaches, cervical pain, and "mood."  (R. 242-282, 411-503, 545-552).  He conducted a number of objective tests: CT scan found mild brain atrophy (R. 242); x-rays showed degenerative disc changes at C6-C7,otherwise normal (R. 243).  He found her depression to be "in remission," and he suggested more exercise, stretching and massage therapy for her neck pain.  (R. 250).  In April 2004, she asked for a letter stating she could not work to take to a divorce hearing because her husband was trying to claim she could work to avoid alimony.  (R. 282).  Dr. Cerra wrote one on April 1, 2004.  (R. 283, 412).

Dr. Gary Kanter wrote a letter to Plaintiff's attorney dated April 1, 2004, possibly in conjunction with the divorce hearing as well, to the effect that she had a number of severe ailments which needed medical treatment.  (R. 556).

Other objective tests in the record were: x-rays on September 1, 2000, which showed mild, perhaps moderate multilevel cervical spondylosis (R. 356) and March 19, 2003, which were the same (R. 414).  A brain MRI on August 7, 2003, which showed mild cortical atrophy, but which was considered normal.  (R. 560-567).

**No. 1:06CV143-MP/AK**

Chiropractic notes from Dr. Hoehn, a chiropractor, in a report made after her initial visit on December 10, 2002, found her to be working at the time    (R. 342-348). He also found it difficult to get an orderly history from her, that she was hypersensitive about her condition, and that she could resume normal working duties with only conservative treatment.  (R. 346-348).  Dr. Draney, also a chiropractor, noted in a "IME rebuttal" on June 4, 2002, that he disagreed with Dr. Hoehn about the course and type of treatment, but also believed that she could improve with more regular and aggressive treatment.  (R. 332).

Two consultative examinations were done: Dr. Nazario on March 6, 2003, (R. 349-353) and Dr. Greenberg on March 20, 2003.  (R. 354-357).  Dr. Nazario did no objective tests, but found her memory to be faulty using the standard question and recall test.

Dr. Greenberg obtained an x-ray and did a range of motion tests and found that she was not putting forth full effort, and that she should be able to work, except for heavy lifting or strenuous exertion.  (R. 357).

Dr. Bordini conducted a full range of psychological and intellectual tests during several visits in December 2003.  (R. 507-543).  He sent her to Dr. Cerra and Rossi for "stabilization" first and then assessed her finding Dementia due to head traumas; Major Depression; Post-Traumatic Stress Disorder; Panic Disorder; Somatoform Disorder; Personality Disorders; with a variety of physical conditions, most notably mild to moderate degenerative disc changes.  (R. 542).  In a Medical Assessment dated June

No. 1:06CV143-MP/AK

2005, he found her to be marked or extremely limited in a variety of capacities.  (R. 553-555).

Two Physical Residual Functional Capacity forms were completed on April 1, 2003, and September 19, 2003, finding her at medium exertional level with only a few postural limitations because of neck pain.  (R. 376-383, 402-409).

Two Psychiatric Review Forms are also in file dated March 14, 2003, and September 15, 2003, which found her to have difficulty in performing sustained and complex tasks and limiting her to simple, routine tasks because of her concentration difficulties.  (R. 358-375, 384-401).

State Farm records show that she was given several wage "loss" payments following her loss of July 22, 2000, regularly through 2003.  (R. 157-168).

## F.  SUMMARY OF THE ADMINISTRATIVE HEARING

Plaintiff's initial hearing was held on June 13, 2005.  (R. 52).  She appeared with her attorney.  (R. 52).  Plaintiff was 53 years old at the time of hearing.  (R. 58).  She claims that she is being treated for severe depression, dementia because of "too many head injuries," Hoffman's disease, seizures, migraines and loss of memory.  (R. 62).  She is prescribed Effexor, Xanax, and Klonipin for her mental health issues, and several pain medications.  (R. 63).  Her primary problems began with a head trauma in July 2000, but she has had five head traumas in all.  (R. 64).  She has headaches all the time, which are severe four or five times a week.  (R. 64).  These began with the 2000 head injury.  (R. 64).  The injury occurred when someone slammed a van door on her

head causing her spinal fluid and blood supply to be "down" for a year and a half.  (R.

65).  She was working at the time.  (R. 65).  Dr. Chodosh treated her for a concussion

and obtained a CAT scan.  (R. 66).  She worked about two months between the 2000

injury and the 2001 injury.  (R. 68).  She has difficulty with balance and headaches

since the 2000 injury and pain in her neck from the 2001 accident, which was treated

with chiropractic care.  (R. 74).  She complains that she cannot lift anything because it

causes her spine to "contract and rotate," and she cannot walk, she crawls around a lot.

(R. 76).  She describes her memory problems as follows:

> The good part is I can watch the same movie over and over again.  The
> bad part is I'll look at the clock after I wake up in the morning and it will
> say 4 o'clock and I'll say it's not 4 o'clock, so I'll go to every clock in the
> house and they'll all say 4 o'clock and because I didn't have the memory
> for what time it is I could go the whole day without any pills or any food or
> any water.

She describes the anxiety as "electricity that shoots up and down," and when she hears

bad news, which is a lot, she tries to get to the Xanax, but if she is in the yard or far

away she will forget and "get stuck in the panic."  (R. 80).  The main thing, she said, is

to try and have her "p.m. medications" in every room because she has too many beds in

the room and the closest one is where she sleeps.  (R. 81).  When asked about her

emotional state, she said she cries often because she cannot do things anymore, she

cannot go places, and she cannot have an animal.  (R. 84).  When asked about why

she could not have an animal, she said her mother was dying of emphysema and she

had to go "through all that."  (R. 84).  Apparently she became very emotional and was

asked to control herself at the hearing or step outside during the vocational expert

**No. 1:06CV143-MP/AK**

testimony, and she asked if that meant she should stop crying, and then suggested that

if she could look the other way she could get quiet.  (R. 85-86).

The hypothetical posed to the expert was:

I want you to assume an individual the claimant's age, education and past
work experience that would require work which is low stress, simple,
unskilled, with one, two or three step instructions and not in close proximity to co-
workers; that means the individual cannot function as a member of a team, a team
member and not in direct contact with the public, although there may be some indirect
contact with the public.  The individual can only lift or carry 10 pounds frequently and 20
pounds occasionally.  However the individual would require a sit and stand option.  The
individual should avoid frequent ascending and descending stairs.  The individual can
perform pushing and pulling motions with the upper and lower extremities within the
aforementioned restrictions.  The individual can't perform activities requiring bilateral
manual dexterity and no gross or fine manipulation.  Due to medication side effects and
the amount of chronic pain the individual should avoid hazards in the work place such
as moving machinery.  As far as postural activities, the individual can perform each of
the following postural activities, occasionally balance and stooping, and crouching,
kneeling and crawling, no climbing.  And the individual has depression which affects her
ability to concentrate on complex or detailed tasks but would remain capable of
understanding, remembering and carrying out simple job instructions.

The expert testified that there were a number of jobs that Plaintiff could perform such as

house sitter, companion or personal attendant, which are light exertional levels requiring

no judgment or skill.  (R. 91-92).

A supplemental hearing was held on November 7, 2005, with Plaintiff and her

attorney in attendance for the purpose of follow up testimony after the submission of

additional medical evidence from Dr. Chodosh and Dr. Cannon.  (R. 102, 104).  Plaintiff

clarified that her last full time job was in 1997 and when asked to explain why she

apparently submitted wage loss statements to State Farm on December 20, 2002, she

said that the agent was wrong.  (R. 113-114).  She received a settlement following the

**No. 1:06CV143-MP/AK**

head injury in 2000 of $25,000. 00 and only worked briefly after that.  (R. 110-114).  She also received a lifetime annuity of $300 a month from a workers compensation injury that occurred in 1985 for a herniated disc.  (R. 115).

**G.**    **DISCUSSION**

a) Treating physicians opinions

If a treating physician's opinion on the nature and severity of a claimant's impairments is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record, the ALJ must give it controlling weight. 20 C.F.R. § 404.1527(d)(2).  Nevertheless, the ALJ may discount the treating physician's opinion if good cause exists to do so. Hillsman v. Bowen, 804 F.2d 1179, 1181 (11th Cir. 1986).  Good cause may be found when the opinion is "not bolstered by the evidence," the evidence "supports a contrary finding," the opinion is "conclusory" or "so brief and conclusory that it lacks persuasive weight," the opinion is "inconsistent with [the treating physician's] own medical records," the statement "contains no [supporting] clinical data or information," the opinion "is unsubstantiated by any clinical or laboratory findings," or the opinion "is not accompanied by objective medical evidence."  Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997); Edwards v. Sullivan, 937 F.2d 580, 583 (11th Cir. 1991), (citing Schnorr v. Bowen, 816 F.2d 578, 582 (11th Cir. 1987)).  If an ALJ rejects a treating physician's opinion, he must give explicit, adequate reasons for so doing, and failure to do so results in the opinion being deemed accepted as true as a matter of law.


**No. 1:06CV143-MP/AK**

MacGregor v. Bowen, 786 F.2d 1050, 1053 (11th Cir. 1986); Marbury v. Sullivan, 957 F.2d 837, 841 (11th Cir. 1992).

Pertinent to this discussion is the fact that there is a small window of time during which Plaintiff's physical and mental condition is relevant –prior to and from her onset date of July 12, 2001, to the date she was insured for Title II disability benefits which is December 31, 2002.  Her treating physicians during this time period were Dr. Rossi, Dr. Chodosh, Dr. Cerra, and Drs. Draney and Hoehn.

The ALJ specifically and expressly addressed the relevant treatment notes of these physicians, but rejected the opinions rendered by Dr. Bordini in December 2003, and Dr. Cerra on April 1, 2004, because these opinions were rendered significantly after the insured status expired.  Neither doctor gave their opinion as to Plaintiff's condition, as it existed before December 31, 2002.  Dr. Cerra's treatment notes prior to December 31, 2002, (Dr. Bordini did not treat Plaintiff prior to December 2003), and objective tests (CT scans and x-rays) made at or before this date show no trauma, only mild cortical atrophy, and only mild degenerative changes.  Apparently there had been no degeneration of Plaintiff's brain since this time, according to a brain MRI taken in 2003, which also showed only mild atrophy which was considered "normal."

The ALJ found Dr. Bordini's test results to be contradictory to his opinion that she was markedly limited.

Thus, with regard to the opinions of these doctors, the ALJ properly gave them less weight than their treatment notes and tests, which contradicted the opinions.

**No. 1:06CV143-MP/AK**

Plaintiff is correct that the ALJ does not address the "Letter to the Chart" made by Dr. Rossi on July 15, 2002, wherein he opines that Plaintiff is unable to work from a physical and mental perspective.  (R. 504).  Plaintiff is also correct that this letter should have been addressed since it is from a treating physician and was made during the relevant time period.  However, having carefully reviewed the letter, the other findings of the ALJ, and the other relevant medical evidence, the undersigned is of the opinion that this error was harmless.  An error by the ALJ will be held harmless if the evidence is strong enough to support the outcome despite the lapse.  <u>Lubinski v. Sullivan</u>, 952 F.2d 214, 216 (8th Cir. 1991); <u>Diorio v. Heckler</u>, 721 F.2d 726, 728 (11th Cir. 1983).  Dr. Rossi was not the only treating physician at this time, the opinion he rendered in the "Letter to the Chart" was contrary to the physical findings he made upon examination, and his opinion that the reasons for her inability to work may be psychiatric in nature is not persuasive of the fact, insofar as he deferred to her psychiatrist on this issue.  Dr. Rossi's opinion is also contrary to a number of objective and highly persuasive tests, which did not confirm his primary diagnoses that she suffered from a post-traumatic head concussion.  A CT scan was considered normal immediately following the head injury and a brain MRI conducted after his opinion showed only mild cortical atrophy, which was, again, considered normal.  Dr. Rossi's letter recites what are mostly subjective complaints made by the Plaintiff at that time, who was expressly there to obtain a disability letter.  Thus, there is nothing inherent in the Rossi opinion that would change the ultimate outcome in this matter.


**No. 1:06CV143-MP/AK**

The ALJ does reference the treatment notes and examination findings of Dr. Rossi, who treated Plaintiff from September 2000 through the relevant time period as supportive of his findings that her condition was not disabling.  (R. 23).  These notes reflect that in January 2001, she reported working extensively, and in March 2001, she showed improvement with medication.  (See R. 228, 239).  Following the accident in July 2001, she reported neck and back pain in January 2002, but considerable relief from medication and swimming.  (R. 226).  She was planning the mission trip to the Honduras and Dr. Rossi was hopeful that her improved conditions would allow for it.  (R. 226).

Likewise, the treatment notes and objective tests conducted by Dr. Cerra during the relevant time period support the ALJ's findings, and are directly contrary to the opinion set forth in the letter he wrote on her behalf to take to her divorce proceeding. The ALJ may disregard such an opinion letter when it is contradictory to a treating physician's treatment notes and objective tests.  See cases cited *supra*.

Dr. Chodosh, who examined her after both accidents, found no trauma from the incidents and the objective tests he conducted at these times are very persuasive that although she may have suffered some type of injury from the accidents, there was no acute "brain injury" from these accidents because no such injury was reflected on the CT scan and MRI.

Finally, the two chiropractor reports are somewhat at odds, but even Dr. Draney did not opine that she was disabled, only that she need more aggressive and regular

**No. 1:06CV143-MP/AK**

treatment to improve.  He disagreed with Dr. Hoehn's assessment (which was considerably more extensive and detailed) that she had reached maximum medical improvement, but he did not address or otherwise refute the assessment Dr. Hoehn made that she could return to normal occupational duties.

It is true that a non-medical source, such as a chiropractor, may properly be accorded less weight than a medical doctor.  Falge v. Apfel, 150 F.3d 1320, 1324 (11th Cir. 1998).  However, the ALJ explained why he considered Dr. Hoehn's report to be persuasive and cited to other evidence from treating medical sources which were consistent with Dr. Hoehn's findings.

Thus, applying the law cited *supra* the ALJ articulated "good cause" for accepting and rejecting the various opinions of the treating physicians, with the exception of the letter from Dr. Rossi, which the undersigned finds to be harmless error.  There is no merit to this ground for reversal or remand.

b) Plaintiff's credibility

A clearly articulated credibility finding with substantial supporting evidence in the record should not be disturbed by a reviewing court.  Foote v. Chater, 67 F.3d 1553, 1562 (11th Cir. 1995); MacGregor v. Bowen, 786 F.2d 1050, 1054 (11th Cir. 1986); Sellers v. Barnhart, 246 F.Supp.2d 1201, 1213 (M.D. Ala. 2002).  The ALJ found that Plaintiff's statements concerning the intensity, duration and limiting effects of her conditions were not entirely credible because there were numerous inconsistencies in the record that she apparently did not resolve even at a supplemental hearing held for

No. 1:06CV143-MP/AK

this purpose.  The ALJ found her vague and difficult to obtain a history from as noted by Dr. Hoehn and Dr. Greenberg.  Indeed, as some of the hearing testimony recited above reflects, her responses were rambling and somewhat inappropriate.  As the ALJ noted, the current medical records indicate a deteriorating mental condition, but there is nothing to support a finding that her mental condition was disabling before December 31, 2002, especially with the evidence of record that she sought wage loss reimbursement from State Farm during this time and reported working.

The unresolved inconsistencies regarding her work could have been a lack of candor on her part or evidence of the deteriorating mental condition the ALJ referenced. Regardless, the ALJ found Plaintiff's inability to clarify when she stopped working to reflect a lack of credibility, and this was his call.  Owens v. Heckler, 748 F.2d 1511, 1514 (11th Cir. 1984) (ALJ has "wide latitude" in evaluating the weight of evidence, particularly the credibility of witnesses).  The ALJ articulated his reasons for finding Plaintiff less than credible, these reasons were supported by the record, and this Court will not second guess those findings.

c) RFC and the hypothetical to the vocational expert

An individual's ability to work must be assessed in light of all her impairments and any related symptoms, including pain, which is referred to as their residual functional capacity (RFC).  20 CFR §404.1545.  A person's residual functional capacity is based on the *most* they can do despite their limitations.  *Id.*  In making this determination all of a person's impairments are considered, even those which are not considered severe,

No. 1:06CV143-MP/AK

and the entire record is to be considered, even non-medical information. *Id.*  The claimant is responsible for providing this evidence. *Id.*  This assessment is first used at Step Four of the evaluation process.  If the ALJ determines that a claimant cannot do his past relevant work, then the same RFC will be used at Step Five in conjunction with the Guidelines to decide if the person can make an adjustment to other work in the national economy.

The ALJ relied upon several functional assessments in the record to support his findings: Dr. Greenberg's findings (R. 357); two non-examining physician's reports (R. 376-383; 402-409); and two psychiatric reviews (r. 358-375, 384-401).  These assessments all precluded strenuous work and/or heavy lifting and included limitations because of her neck pain, as well as restricting the range of jobs she could perform to simple routine tasks because of her mental limitations.  These were included in the hypothetical given to the vocational expert, who named jobs which Plaintiff could perform within these parameters.  Incidentally, the jobs were of the type that Plaintiff had been performing perhaps through the date she was last insured for benefits.  The issue of whether or not she could perform this type work when there was evidence that she was in fact still performing this type of work was crucial to the ALJ's decision.  A supplemental hearing was held to provide Plaintiff an opportunity to explain this better and she did not.  The argument that her mental limitations prevented her from clarifying this point to the ALJ's satisfaction is not persuasive since she had counsel at the

**No. 1:06CV143-MP/AK**

hearings, whose purpose was to represent her, *i.e.* speak for her, if she was unable to express herself.

The ALJ stated his reasons for not adopting the assessments made by Dr. Bordini, and why he found other evidence in the record more persuasive of her actual abilities.  Since he did not find Plaintiff to be entirely credible with regard to her limitations, he was not required to accept her subjective complaints as indicative of her limitations nor was he required to include all of her complaints in a hypothetical to the vocational expert.  The ALJ is only required to pose those limitations he finds severe in the hypothetical to the expert.  Pendley v. Heckler, 767 F.2d 1561, 1563 (11th Cir. 1985).

In summary, it is apparent to the Court that at the time of the hearing Plaintiff's mental condition was causing her difficulties.  However, whatever her condition was then or is now is immaterial insofar as obtaining benefits because she no longer qualified for Title II benefits as of December 31, 2002.  Ware v. Schweiker, 651 F.2d 408, 412 n.3 (5th Cir. 1981).  The evidence before the ALJ as to her condition at the time she qualified for benefits was that she had only mild conditions with regard to her neck, and the trauma she experienced from two accidents was not severe since it did not show on any objective tests taken right after the incidents or even years later.  What limitations she has developed since the 2001 accident do not appear to be a result of the injuries incurred then, as she contends, and if they are entirely a result of a mental disorder the evidence of record does not support a finding that the condition was so

**No. 1:06CV143-MP/AK**

severe as of December 31, 2002, as to preclude her from working, especially since the

evidence is not conclusive that she was **not** working.

Accordingly, it is respectfully **RECOMMENDED**:

That the decision of the Commissioner denying benefits be **AFFIRMED.**

At Gainesville, Florida, this ___*1*^st___ day of February, 2008.

*s/ A. KORNBLUM*
**ALLAN KORNBLUM**
**UNITED STATES MAGISTRATE JUDGE**

<u>**NOTICE TO THE PARTIES**</u>

**A party may file specific, written objections to the proposed findings and recommendations within 15 days after being served with a copy of this report and recommendation.  A party may respond to another party's objections within 10 days after being served with a copy thereof.  Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.**

**No. 1:06CV143-MP/AK**